# In re Fauziya KASINGA, Applicant

## File A73 476 695 - Elizabeth

*Decided June 13, 1996*

## U.S. Department of Justice
### Executive Office for Immigration Review
### Board of Immigration Appeals

(1) The practice of female genital mutilation, which results in permanent disfiguration and poses a risk of serious, potentially life-threatening complications, can be the basis for a claim of persecution.

(2) Young women who are members of the Tchamba-Kunsuntu Tribe of northern Togo who have not been subjected to female genital mutilation, as practiced by that tribe, and who oppose the practice, are recognized as members of a "particular social group" within the definition of the term "refugee" under section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1994).

(3) The applicant has met her burden of proving through credible testimony and supporting documentary evidence (1) that a reasonable person in her circumstances would fear country-wide persecution in Togo on account of her membership in a recognized social group and (2) that a favorable exercise of discretion required for a grant of asylum is warranted.

FOR APPLICANT: Karen Musalo, Esquire, Washington, D.C.

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: David A. Martin, General Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; HOLMES, HURWITZ, VILLAGELIU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinions: FILPPU, Board Member, joined by HEILMAN, Board Member; ROSENBERG, Board Member. Dissenting Opinion: VACCA, Board Member.

SCHMIDT, Chairman:

This is a timely appeal by the applicant from a decision of an Immigration Judge dated August 25, 1995. The Immigration Judge found the applicant excludable as an intending immigrant, denied her applications for asylum and withholding of deportation, and ordered her excluded and deported from the United States. Upon reviewing the appellate record anew ("de novo review"), we will sustain the applicant's appeal, grant asylum, and order her admitted to the United States as an asylee.

A fundamental issue before us is whether the practice of female genital mutilation ("FGM") can be the basis for a grant of asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994). On appeal, the parties agree that FGM can be the basis for a grant of asylum. We find that FGM can be a basis for asylum.

Nevertheless, the parties disagree about 1) the parameters of FGM as a ground for asylum in future cases, and 2) whether the applicant is entitled to asylum on the basis of the record before us. In deciding this case, we decline to speculate on, or establish rules for, cases that are not before us.

We make seven major findings in the applicant's case. Those findings are summarized below.

First, the record before us reflects that the applicant is a credible witness. Second, FGM, as practiced by the Tchamba-Kunsuntu Tribe of Togo and documented in the record, constitutes persecution. Third, the applicant is a member of a social group consisting of young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. Fourth, the applicant has a well-founded fear of persecution. Fifth, the persecution the applicant fears is "on account of" her social group. Sixth, the applicant's fear of persecution is country-wide. Seventh, and finally, the applicant is eligible for and should be granted asylum in the exercise of discretion. Each finding is explained below.

## I. CREDIBILITY

### A. The Applicant's Testimony

The applicant is a 19-year-old native and citizen of Togo. She attended 2 years of high school. She is a member of the Tchamba-Kunsuntu Tribe of northern Togo. She testified that young women of her tribe normally undergo FGM at age 15. However, she did not because she initially was protected from FGM by her influential, but now deceased, father.

The applicant stated that upon her father's death in 1993, under tribal custom her aunt, her father's sister, became the primary authority figure in the family. The applicant's mother was driven from the family home, left Togo, and went to live with her family in Benin. The applicant testified that she does not currently know her mother's exact whereabouts.

The applicant further testified that her aunt forced her into a polygamous marriage in October 1994, when she was 17. The husband selected by her aunt was 45 years old and had three other wives at the time of marriage. The applicant testified that, under tribal custom, her aunt and her husband planned to force her to submit to FGM before the marriage was consummated.

The applicant testified that she feared imminent mutilation. With the help of her older sister, she fled Togo for Ghana. However, she was afraid that her

aunt and her husband would locate her there. Consequently, using money from her mother, the applicant embarked for Germany by airplane.

Upon arrival in Germany, the applicant testified that she was somewhat disoriented and spent several hours wandering around the airport looking for fellow Africans who might help her. Finally, she struck up a conversation, in English, with a German woman.

After hearing the applicant's story, the woman offered to give the applicant temporary shelter in her home until the applicant decided what to do next. For the next 2 months, the applicant slept in the woman's living room, while performing cooking and cleaning duties.

The applicant further stated that in December 1994, while on her way to a shopping center, she met a young Nigerian man. He was the first person from Africa she had spoken to since arriving in Germany. They struck up a conversation, during which the applicant told the man about her situation. He offered to sell the applicant his sister's British passport so that she could seek asylum in the United States, where she has an aunt, an uncle, and a cousin. The applicant followed the man's suggestion, purchasing the passport and the ticket with money given to her by her sister.

The applicant did not attempt a fraudulent entry into the United States. Rather, upon arrival at Newark International Airport on December 17, 1994, she immediately requested asylum. She remained in detention by the Immigration and Naturalization Service ("INS") until April 1996.

The applicant testified that the Togolese police and the Government of Togo were aware of FGM and would take no steps to protect her from the practice. She further testified that her aunt had reported her to the Togolese police. Upon return, she would be taken back to her husband by the police and forced to undergo FGM. She testified at several points that there would be nobody to protect her from FGM in Togo.

In her testimony, the applicant referred to letters in the record from her mother (Exh. 3). Those letters confirmed that the Togolese police were looking for the applicant and that the applicant's father's family wanted her to undergo FGM.

The applicant testified that she could not find protection anywhere in Togo. She stated that Togo is a very small country and her husband and aunt, with the help of the police, could locate her anywhere she went. She also stated that her husband is well known in Togo and is a friend of the police. On cross-examination she stated that it would not be possible for her to live with another tribe in Togo.

The applicant also testified that the Togolese police could locate her in Ghana. She indicated that she did not seek asylum in Germany because she could not speak German and therefore could not continue her education there. She stated that she did not have relatives in Germany as she does in the United States.

## B. Background Information

### 1. The Asylum Application

The applicant's written asylum application was filed on April 18, 1995, while she was in INS detention (Exh. 3). That application is consistent with the above testimony in all material respects.

A number of documents are attached to the applicant's asylum application. First, there are copies of two letters, dated December 27, 1994, and December 30, 1994, respectively, signed by the applicant's mother. The letters are in English. One letter confirms that the applicant's father's family wishes to have the applicant marry an older man and be subjected to FGM. That letter further confirms that the applicant's mother gave the applicant money to assist her escape. The other letter confirms that the Togolese police were looking for the applicant following her escape in October 1994.

The applicant testified that 1) her mother cannot write English; 2) the letters were prepared by the applicant's sister, at her mother's request; and 3) the letters are signed by the applicant's mother (Tr. at 62-63).

A translated copy of the applicant's marriage certificate also is appended to the asylum application. That document, dated October 7, 1994, is signed by the applicant's husband, but not by the applicant.

Finally, an untranslated document in French, perhaps from the police in Togo, is attached to the asylum application. The applicant did not rely on the untranslated document at the hearing. The INS trial attorney neither objected to the admission of the untranslated document nor cross-examined the applicant with respect to it. The Immigration Judge did not mention the untranslated document.

### 2. Applicant's Other Exhibits

The applicant's prior counsel also offered a letter dated August 24, 1995, from Charles Piot, Assistant Professor of Cultural Anthropology at Duke University (Exh. 6). That letter 1) states that it was written at counsel's request, on the basis of information furnished by counsel; 2) briefly describes Professor Piot's qualifications as a cultural anthropologist who spent 3 years doing research in Northern Togo in the 1980s; and 3) offers the opinion that a woman of the Tchamba people probably would be expected by her husband to have undergone a clitoridectomy (a type of FGM) prior to marriage.

The Immigration Judge admitted the Piot letter into evidence (Tr. at 89). The Immigration Judge noted that the weight given the letter would be affected by the inability of the INS to cross-examine Professor Piot. However, the Immigration Judge also stated that he "would accept the applicant on her word, that the tribe requires the circumcision [FGM] prior to marriage." (Tr. at 89).

The applicant also submitted pictures of herself in tribal ceremonial dress at the time of her marriage. Those pictures were admitted into evidence (Exh. 5), and the applicant testified to their authenticity (Tr. at 70-71).

### 3.  Group Exhibit 4

The applicant's prior counsel also filed a lengthy pre-hearing brief accompanied by extensive documentation. That documentation included information on the practice of FGM, its harmful effects on women, its lack of legitimate justification, and its condemnation by the international community. The documentation also confirmed the generally poor human rights situation in Togo, particularly for women. These background materials are designated "Group Exhibit" 4 in the record.

### 4.  Description of FGM

According to the applicant's testimony, the FGM practiced by her tribe, the Tchamba-Kunsuntu, is of an extreme type involving cutting the genitalia with knives, extensive bleeding, and a 40-day recovery period (Tr. 30-31, 41). The background materials confirm that the FGM practiced in some African countries, such as Togo, is of an extreme nature causing permanent damage, and not just a minor form of genital ritual. *See, e.g.,* Nahid Toubia, *Female Genital Mutilation: A Call for Global Action* 9, 24-25 (Gloria Jacobs ed., Women Ink. 1993).

The record material establishes that FGM in its extreme forms is a practice in which portions of the female genitalia are cut away. In some cases, the vagina is sutured partially closed. This practice clearly inflicts harm or suffering upon the girl or woman who undergoes it.

FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions. *See generally* Toubia*, supra;* INS Resource Information Center, *Alert Series - Women - Female Genital Mutilation*, Ref. No. AL/NGA/94.001 (July 1994) [hereinafter *FGM Alert*].

The *FGM Alert*, compiled and distributed by the INS Resource Information Center, notes that "few African countries have officially condemned female genital mutilation and still fewer have enacted legislation against the practice." *FGM Alert, supra*, at 6. Further, according to the *FGM Alert*, even in those few African countries where legislative efforts have been made, they are usually ineffective to protect women against FGM. The *FGM Alert* notes that "it remains practically true that [African] women have little legal recourse and may face threats to their freedom, threats or acts of physical violence, or social ostracization for refusing to undergo this harmful traditional

practice or attempting to protect their female children." *Id.* at 6-7. Togo is not listed in the *FGM Alert* as among the African countries that have made even minimal efforts to protect women from FGM.

The record also contains a May 26, 1995, memorandum from Phyllis Coven, Office of International Affairs, INS, which is addressed to all INS Asylum Officers and sets forth guidelines for adjudicating women's asylum claims. Coven, U.S. Dep't of Justice, *Considerations For Asylum Officers Adjudicating Claims From Women* (1995). Those guidelines state that "rape . . . , sexual abuse and domestic violence, infanticide and genital mutilation are forms of mistreatment primarily directed at girls and women and they may serve as evidence of past persecution on account of one or more of the five grounds." Coven, *supra*, at 4.

### 5. State Department Reports on Conditions in Togo

The record also contains two reports compiled by the United States Department of State. The first of these, dated January 31, 1994, 1) confirms that FGM is practiced by some ethnic groups in Togo; 2) notes that while some reports indicate that the practice may be diminishing, an expert indicates that as many as 50% of Togolese females may have been mutilated; and 3) notes that various acts of violence against women occur in Togo with little police intervention. Committees on Foreign Affairs and Foreign Relations, 103d Cong., 2d Sess., *Country Report on Human Rights Practices for 1993* (Joint Comm. Print 1994) [hereinafter 1993 *Country Reports*].

The second Department of State Report on Togo, prepared by the Bureau of Democracy, Human Rights and Labor, is dated April 1995. Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *Togo - Profile of Asylum Claims & Country Conditions* (April 1995) [hereinafter *Profile*]. While not specifically addressing FGM, that report states that the President of Togo has a poor human rights record and confirms that the government's military and security forces have been involved in serious human rights abuses.

At the hearing, the Immigration Judge decided not to include in the record a third State Department Report, the February 1995 *Country Reports on Human Rights Practices for 1994*, because the information basically duplicated the two reports already submitted. *See* Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1994* 268 (Joint Comm. Print 1995). Neither counsel objected to the Immigration Judge's decision to exclude the February 1995 report.

### C. INS Cross-Examination and Request for Remand

During the hearing before the Immigration Judge, the INS had an opportunity to cross-examine the applicant and to offer documentary evidence of its

own having a bearing on the case. The INS submitted no documentary evidence.

As discussed below, the INS general attorney's cross-examination of the applicant revealed no meaningful inconsistencies in her testimony. The INS does not claim that the applicant is incredible, nor does the INS argue that the Immigration Judge's adverse credibility determination was correct. Rather, the INS requests that the record be remanded for further examination of the applicant's credibility. The INS cites four specific matters in support of its request.

First, the INS asserts that the applicant testified in an inconsistent manner because she gave several different answers regarding who performs FGM in her tribe. At one point, the applicant stated that an older man of the tribe performed the procedure (Tr. at 24). At another point, she indicated that an old lady or an official circumcisor performed the operation (Tr. at 31-32).

These are not inconsistencies that undermine credibility. It is understandable that a teenage girl, who has been protected from FGM by her father, and who has never been subjected to the process, might have an imperfect understanding of who actually performs the procedure in her tribe. We also note that the applicant had been attending high school outside Togo, in Ghana, during the time immediately preceding her father's death. The INS does not challenge the applicant's membership in the Tchamba-Kunsuntu Tribe, nor does it contend that the tribe does not practice FGM. When viewed in the context of the entire record, the ambiguous answers as to who performs FGM in the tribe do not undermine the applicant's credibility. *See Matter of B-*, 21 I&N Dec. 66 (BIA 1995).

We reject the INS's second suggestion that there is a material discrepancy in the applicant's testimony regarding her marital status. The record establishes that the applicant was married against her will to an older man of her tribe, and the marriage was never consummated. The marriage certificate was not signed by the applicant. She fled the country shortly after the marriage, before she had been delivered to her husband's house. Understandably, in the particular circumstances of this case, the teenage applicant may, in her own mind, be uncertain as to whether she is actually "married" to her husband in Togo. The statement in her asylum application that she "would be forced to marry an old man, and be [circumcised]" is basically consistent with her testimony and the corroborating evidence she presented.

We also reject the INS's third challenge to the applicant's credibility. During oral argument, the General Counsel referred to the need to explore the matter of the "untranslated document" attached to the asylum application (O.A. at 33). However, he acknowledged that the INS had an opportunity to explore this matter below and did not do so (O.A. at 34). The INS is not entitled to another opportunity to try this issue. *See Matter of Guevara*, 20 I&N Dec. 238, 249 (BIA 1991).

We acknowledge the INS's fourth point—that a number of the applicant's answers on both direct and cross-examination were "inaudible" in the transcript. Nevertheless, there is ample audible testimony from the applicant that supports her asylum application. It is very unlikely that any of the "inaudible" portions of the transcript contained highly relevant material impeaching the applicant's credibility. If that were the case, we certainly would expect the INS to have brought it to our attention through an affidavit or declaration from its general attorney who was present at the hearing below.

Finally, the INS has not suggested that it has any newly discovered, previously unavailable documentary evidence relating to conditions in Togo or the likelihood of country-wide persecution.

For the foregoing reasons, a remand is not necessary. This is particularly true in light of the length of time the applicant's asylum application has been pending.

## D. The Applicant's Credibility

We have conducted an independent review of the applicant's credibility. We note that the Immigration Judge's adverse credibility determination was based on a perceived lack of "rationality," "persuasiveness," and "consistency." The Immigration Judge did not rely on the applicant's demeanor. We, like the Immigration Judge, can determine from the record whether the applicant's testimony is "rational, plausible, and consistent."

We find that the applicant's testimony in support of her asylum application is plausible, detailed, and internally consistent. *See Matter of B-, supra.* It is consistent with her asylum application and with the substantial background information in the record. The latter includes information from the Department of State and the INS Resource Information Center.

The applicant is a 19-year-old woman, who was a 17-year-old high school student at the time the events in question occurred. The applicant's father had died, she was separated from her mother, and she was under the control of an unsympathetic aunt. Her arrival in the United States followed flight from her homeland and a lonely journey of thousands of miles that took her through a strange country. Her testimony followed more than 8 months of continuous INS detention, in several facilities, one of which was closed by a riot.

We specifically reject the Immigration Judge's findings that the applicant's failure to know the present whereabouts of her mother; her claim to have avoided FGM through her father's efforts; the incident involving the German woman; or the incident with the Nigerian man were irrational, unpersuasive, or inconsistent. Each of those matters was adequately and reasonably explained by the applicant during her testimony and each of them reasonably could have happened to a teenage girl in the applicant's situation. Her testimony on these points was not impeached by the INS through cross-examination.

For the foregoing reasons, on the basis of the record before us, we find the applicant to be a credible witness.

## II.  FGM AS PERSECUTION

For the purposes of this case, we adopt the description of FGM drawn from the record and summarized in Part I.B.4. of this opinion. We agree with the parties that this level of harm can constitute "persecution" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994).

While a number of descriptions of persecution have been formulated in our past decisions, we have recognized that persecution can consist of the infliction of harm or suffering by a government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim. *See Matter of Acosta,* 19 I&N Dec. 211, 222-23 (BIA 1985), *modified on other grounds, Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987). The "seeking to overcome" formulation has its antecedents in concepts of persecution that predate the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. *See, e.g., Matter of Diaz,* 10 I&N Dec. 199, 204 (BIA 1963).

As observed by the INS, many of our past cases involved actors who had a subjective intent to punish their victims. However, this subjective "punitive" or "malignant" intent is not required for harm to constitute persecution. *See Matter of Kulle*, 19 I&N Dec. 318 (BIA 1985); *Matter of Acosta, supra*.

Our characterization of FGM as persecution is consistent with our past definitions of that term. We therefore reach the conclusion that FGM can be persecution without passing on the INS's proposed "shocks the conscience" test. We also agree with the parties that this case is not controlled by *Matter of Chang,* 20 I&N Dec. 38 (BIA 1989) (holding that China's population control policy is not persecution).

## III.  SOCIAL GROUP

To be a basis for a grant of asylum, persecution must relate to one of five categories described in section 101(a)(42)(A) of the Act. The parties agree that the relevant category in this case is "particular social group." Each party has advanced several formulations of the "particular social group" at issue in this case. However, each party urges the Board to adopt only that definition of social group necessary to decide this individual case.

In the context of this case, we find the particular social group to be the following: young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. This is very similar to the formulations suggested by the parties.

The defined social group meets the test we set forth in *Matter of Acosta, supra,* at 233. *See also Matter of H-*, 21 I&N Dec. 337 (BIA 1996) (finding that identifiable shared ties of kinship warrant characterization as a social

group). It also is consistent with the law of the United States Court of Appeals for the Third Circuit, where this case arose. *Fatin v. INS*, 12 F.3d 1233, 1241 (3d Cir. 1993) (stating that Iranian women who refuse to conform to the Iranian Government's gender-specific laws and social norms may well satisfy the *Acosta* definition).

In accordance with *Acosta*, the particular social group is defined by common characteristics that members of the group either cannot change, or should not be required to change because such characteristics are fundamental to their individual identities. The characteristics of being a "young woman" and a "member of the Tchamba-Kunsuntu Tribe" cannot be changed. The characteristic of having intact genitalia is one that is so fundamental to the individual identity of a young woman that she should not be required to change it.

## IV. WELL-FOUNDED FEAR

The burden of proof is upon an applicant for asylum to establish that a "reasonable person" in her circumstances would fear persecution upon return to Togo. *Matter of Mogharrabi*, 19 I&N Dec. 439, 445 (BIA 1987). The applicant has met this burden through a combination of her credible testimony and the introduction of documentary evidence and background information that supports her claim. *See Matter of B-, supra; Matter of Dass,* 20 I&N Dec. 120 (BIA 1989).

## V. "ON ACCOUNT OF"

To be eligible for asylum, the applicant must establish that her well-founded fear of persecution is "on account of" one of the five grounds specified in the Act, here, her membership in a "particular social group." *See, e.g., Matter of H-, supra* (holding that harm or abuse because of clan membership constitutes persecution on account of social group).

Both parties have advanced, and the background materials support, the proposition that there is no legitimate reason for FGM. Group Exhibit 4 contains materials showing that the practice has been condemned by such groups as the United Nations, the International Federation of Gynecology and Obstetrics, the Council on Scientific Affairs, the World Health Organization, the International Medical Association, and the American Medical Association.

Record materials state that FGM "has been used to control woman's sexuality," *FGM Alert, supra*, at 4. It also is characterized as a form of "sexual oppression" that is "based on the manipulation of women's sexuality in order to assure male dominance and exploitation." Toubia, *supra*, at 42 (quoting Raqiya Haji Dualeh Abdalla, Somali Women's Democratic Organization).

During oral argument before us, the INS General Counsel agreed with the latter characterization. (O.A. at 41). He also stated that the practice is a

"severe bodily invasion" that should be regarded as meeting the asylum standard even if done with "subjectively benign intent" (O.A. at 42).

We agree with the parties that, as described and documented in this record, FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women of the tribe who have not been, and do not wish to be, subjected to FGM. We therefore find that the persecution the applicant fears in Togo is "on account of" her status as a member of the defined social group.

## VI.  COUNTRY-WIDE PERSECUTION

The INS suggests, in its brief and at oral argument, that a remand is necessary because the applicant has not established that she would be unable to avoid FGM by moving to some other part of Togo. As we found in Part I of our opinion, the applicant presented credible testimony that her husband is a well-known individual who is a friend of the police in Togo. She testified that her aunt and her husband were looking for her and that there could be no refuge for her because Togo is a small country and the police would not protect her (Tr. at 59, 61, 65, 73, 74, 78, 86, 87).

The applicant's testimony is consistent with the background information in the record. That information confirms that 1) FGM is widely practiced in Togo; 2) acts of violence and abuse against women in Togo are tolerated by the police; 3) the Government of Togo has a poor human rights record; and 4) most African women can expect little governmental protection from FGM. *See* 1993 *Country Reports, supra; Profile, supra; FGM Alert, supra*, at 6-7. We also take notice that Togo is a small country of approximately 22,000 square miles, slightly smaller than West Virginia.

Neither in its briefs nor at oral argument did the INS raise any claim of "new evidence" that might show changed country conditions. We assume that if the INS had any new documentation showing that the applicant could find safety from FGM elsewhere in Togo, it would have offered that evidence in support of its motion to remand.

For the foregoing reasons, we find that this record adequately supports the applicant's claim that she has a country-wide fear of persecution in Togo.

## VII.  DISCRETION

We have determined that the applicant is eligible for asylum because she has a well-founded fear of persecution on account of her membership in a particular social group in Togo. A grant of asylum to an eligible applicant is discretionary. The final issue is whether the applicant merits a favorable exercise of discretion. The danger of persecution will outweigh all but the most egregious adverse factors. *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987). The type of persecution feared by the applicant is very severe.

To the extent that the Immigration Judge suggested that the applicant had a legal obligation to seek refuge in Ghana or Germany, the record does not support such a conclusion. The applicant offered credible reasons for not seeking refuge in either of those countries in her particular circumstances.

The applicant purchased someone else's passport and used it to come to the United States. However, upon arrival, she did not attempt to use the false passport to enter. She told the immigration inspector the truth. *See Matter of Y-G-,* 20 I&N Dec. 794 (BIA 1994).

We have weighed the favorable and adverse factors and are satisfied that discretion should be exercised in favor of the applicant. Therefore, we will grant asylum to the applicant.

## VIII. ANCILLARY MATTERS

In view of our disposition of the applicant's case, we will deny the INS's request to remand. We find it unnecessary to consider the new evidentiary materials submitted by the applicant on appeal. We also do not reach the applicant's alternate claim that she has a well-founded fear of persecution on the basis of a forced polygamous marriage. Moreover, it is unnecessary for us to adjudicate the applicant's application for withholding of deportation.

## IX. SUMMARY AND CONCLUSION

The applicant has a well-founded fear of persecution in the form of FGM if returned to Togo. The persecution she fears is on account of her membership in a particular social group consisting of young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice. Her fear of persecution is country-wide. We exercise our discretion in her favor, and we grant her asylum.

Therefore, we sustain the applicant's appeal, grant her asylum, and order her admitted to the United States. The following orders are entered.

**ORDER:** The applicant's appeal is sustained. The applicant is granted asylum and admitted to the United States as an asylee.

**FURTHER ORDER:** The INS's motion to remand is denied.

*CONCURRING OPINION:* Lauri S. Filppu, Board Member, joined by Michael J. Heilman, Board Member, joined

I respectfully concur. I write separately in part to respond more completely to several arguments advanced by the Immigration and Naturalization Service.

## I. INTRODUCTION

The questions necessarily presented to the Board by virtue of the positions advanced by the parties in this case are narrow. The majority resolves the

case on those grounds, and properly declines to address issues raised by the Service that go well beyond those essential to the disposition of this appeal.

While they offer slightly different theories, the parties agree that female genital mutilation ("FGM") can amount to persecution, that there is a "particular social group" of which the applicant may be a member, and that the serious harm the applicant fears from FGM would be inflicted "on account of" her membership in that social group. The case-specific issues presented by the parties for our resolution concern the need for a remand respecting the credibility of the applicant and the precise arguments for finding FGM to constitute a basis for asylum on this record.

The parties naturally understand that this case may well have implications beyond its facts. But only the Service asks that we adopt a framework of analysis which is specifically intended to address issues, such as past persecution questions, that are *not* presented by the facts of this case. It is unclear whether there is an *immediate* need for a more comprehensive analytical framework in which to assess FGM claims. To the extent it is needed to address the concerns raised by the Service, that comprehensive guidance could more appropriately be issued through the legislative or regulatory process, not the Board's case adjudication process.

## II. THE QUESTIONS IN THIS CASE

### A. Credibility and Remand

The Immigration Judge determined the applicant to lack credibility, primarily because he found aspects of her story implausible. Although it is not determinative, the Immigration Judge's assessment is not without some force. Indeed, the Service relies on some of the same aspects of the applicant's claim in requesting a remand. But the Service also seeks a remand to explore aspects of the record that could have been explored when the case was before the Immigration Judge. And, as the Immigration Judge's finding was not based on demeanor, the majority appropriately makes an independent assessment of credibility.

It would have been preferable for the applicant to have offered corroboration of some aspects of her story, particularly in relation to her arrival and stay in Germany, which bear on her overall veracity. But the unresolved questions raised by that portion of her account are not sufficient for an adverse credibility finding on this record. Nor is a remand warranted when the Service's other concerns pertain mainly to suspicions that are raised for the first time on appeal.

### B. The Persecution Issues

The parties offer different theories for why FGM can amount to persecution, with the Service offering a novel "shocks the conscience" theory as part

of its analysis. For purposes of this case, it is sufficient to observe that the level of suffering associated with FGM, as practiced by the applicant's tribe, would be more than enough to constitute persecution if inflicted exclusively on a religious or political minority.

The "on account of" and "particular social group" requirements of the statute are not in dispute here, except to the extent that the applicant's proposed "social group" definition includes an element of personal opposition by the victim which is not included in the Service's proposal. It is not essential to choose between these offerings. In view of the positions taken by the parties, the applicant would qualify for relief under either proffered social group.[1]

I agree with a favorable exercise of discretion on this record. Given the severity of FGM as practiced by the applicant's tribe, the near certainty of its application to her if she were to return to Togo, and the positions taken by the parties on the legal issues, a grant of asylum is in order. *See Matter of Pula,* 19 I&N Dec. 467 (BIA 1987).

## III. THE SERVICE'S FRAMEWORK

Despite the absence of any major dispute between the parties in this case, the Service requests that we adopt its broad "framework of analysis" for claims of this type. Its suggestion candidly is aimed at addressing issues it sees arising in relation to claims that may be made by women from other "parts of the world where FGM is practiced" and by those "who have been subjected to it in the past." (Brief at 15).

The Board engages in case adjudication. It decides those issues that lead to the resolution of the cases before it. Our published rulings act as precedent under the regulations, 8 C.F.R. § 3.1(g) (1995), and can affect many related cases. But the Board is not well positioned, in the context of a single disposition of a novel issue, to establish comprehensive rules or guidelines for the adjudication of all cases presenting variations on the case at hand. Yet, it is the cases that are *not* before us that seem to draw much of the Service's attention in its brief.

The Service points out that it is "estimated that over eighty million females have been subjected to FGM." (Brief at 13). It further notes that there is "no indication" that "Congress considered application of [the asylum laws] to broad cultural practices of the type involved here." (Brief at 14). The Service proceeds to argue that "the underlying purposes of the asylum system . . . are unavoidably in tension" in both providing protection for those seriously in jeopardy and in maintaining broad overall governmental control over

---

[1] This is not to say we are bound absolutely by the parties' arguments. But we face here an issue of first impression, in relation to FGM claims, and we lack the benefit of either amicus briefing or supplemental briefing on questions we might pose. In the absence of any dispute of consequence between the parties, there is no need to resolve this particular question in order to decide the case.

immigration (Brief at 14-15). The Service further argues that "the Board's interpretation in this case must assure protection for those most at risk of the harms covered by the statute, but it cannot simply grant asylum to all who might be subjected to a practice deemed objectionable or a violation of a person's human rights." (Brief at 15). It is from these underpinnings that the Service argues that the class of FGM victims who may be eligible for asylum "does not consist of all women who come from the parts of the world where FGM is practiced, nor of all who have been subjected to it in the past." (Brief at 15).

The Service then offers its "framework of analysis." That framework includes a new "shocks the conscience" test for persecution. The advantages seen by the Service of this test evidently include: 1) the ability to define FGM as "persecution" notwithstanding any lack of intent to "punish" FGM victims on the part of the victims' parents or tribe members who may well "believe that they are simply performing an important cultural rite that bonds the individual to the society"; 2) the ability to exclude other cultural practices, such as "body scarring," from the definition of persecution as these do not shock the conscience; and 3) the ability to exclude past victims of FGM from asylum eligibility if "they consented" to it or "at least acquiesced," as in the case of a woman who experienced FGM as "a small child," since FGM would not shock the conscience unless inflicted on "an unconsenting or resisting individual." (Brief at 16-18).

With respect to the past persecution question, the Service references 8 C.F.R. § 208.13(b)(1) (1995), and notes "that a woman once circumcised cannot ordinarily be subjected to FGM a second time." (Brief at 18 n.3). The regulation cited by the Service provides in part for a presumption of future persecution that arises from past persecution, and allows only one way of overcoming the presumption, namely, a change in country conditions. As conditions in countries where FGM is practiced may not have changed, it may be anomalous to have a binding presumption of future persecution where the act of persecution will never again take place for the individual past victim.[2]

The Service's broad framework of analysis also seems to have led it to offer a social group definition that in one respect fits the test set forth in *Matter of Acosta,* 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), yet is also defined largely by the harm sought to be included in the concept of persecution (Brief at 19-21). For example, we simply do not know from this record whether the similar social groups proposed by the parties are recognized as groupings for

---

[2] It might also be anomalous if persons facing death in their homelands because of religious or political persecution were denied protection for having "assisted, or otherwise participated in the persecution" of their children simply by virtue of being parents of FGM victims and having followed tribal custom. *See* section 243(h)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2)(A) (1994); 8 C.F.R. § 208.13(c).

any other purposes within Togolese society aside from the serious personal harm at issue here. The record does not disclose whether this group is seen as a distinct body within Togo or within the tribe both before and after the infliction of FGM on its members, or whether it is a group that exists exclusively in relation to the particular offensive practice at issue here. Because the social group definition has not been a real source of dispute between the parties, we are also not well informed as to the degree of affiliation between or the homogeneity among its members. *See Sanchez-Trujillo v. INS*, 801 F.2d 1571 (9th Cir. 1986).[3]

The Service does not offer its new framework of analysis for our consideration as part of an effort to harmonize a line of past rulings, or otherwise to put some order into a series of decisions that have addressed FGM questions in a variety of contexts. Instead, the Service offers its new analysis in the context of a case of first impression for the Board. It sets out what appear to be a variety of policy considerations and potential areas of concern that might arise in related but nevertheless different cases. It then tries to develop a unifying theory or approach that would support grants of asylum to persons who may prospectively face FGM, but would not routinely make asylum available to persons who have simply previously suffered FGM.

It may be that the Board will end up with an analysis along the lines proposed by the Service as it confronts various issues involving asylum and FGM in the future. Then again the Board may settle upon a different view, which may be better or worse from the perspective of particular parties. But I am fully in agreement with the majority's decision not to attempt to set forth a comprehensive analytical framework in the context of this one case.

The Board certainly is not oblivious to immigration policy considerations in the disposition of cases falling within our jurisdiction. But we are not fundamentally a policy-making body. There may be some unsettling or unsatisfying aspects to the slower and less predictable development of legal guidelines that inures in the Board's case adjudication system. But there are alternatives if resort to the Board's issuance of precedent is not satisfactory in a particular context. The Service can seek to have the Attorney General issue regulations that comprehensively address competing concerns, or it can work within the Administration for appropriate legislative action by Congress.[4] The Service should not, however, expect the Board to endorse a significant

---

[3] But for the concession of the Service on this point, I would be inclined to remand this case for further development on the "social group" question. The meaning of the phrase "membership in a particular social group" has not been completely explained by our case law. Nevertheless, it is questionable whether the statute was meant to encompass groups that are defined principally in relation to the harm feared by the asylum applicant. *See Bastanipour v. INS,* 980 F.2d 1129, 1132 (7th Cir. 1992); *Gomez v. INS*, 947 F.2d 660, 663-64 (2d Cir. 1991). The record here sheds little light on this question.

[4] Indeed, appropriate new legislation might prove to be the better answer if principles of asylum law in fact end up creating the types of anomalies identified by the Service.

new framework for assessing asylum claims in the context of a single novel case, especially when that framework seems intended primarily to address cases that are not in fact before the Board yet.

*CONCURRING OPINION:* Lory D. Rosenberg, Board Member

Today, in the specific case before us, this Board decides that a young woman of a particular tribe in Togo, who opposes being subjected to female genital mutilation as practiced by that tribe, is a member of a particular social group, and that on account of that membership, a reasonable person could fear persecution as defined in the Immigration and Nationality Act. I join the majority decision in its entirety.

This is, in some respects, a case of first impression. Given our purpose to interpret the statute and regulations, to provide guidance to a field of some 200 Immigration Judges, countless Immigration and Naturalization Service officers, and the public, and to achieve consistency and uniformity in both the procedure and substance of adjudications, there are three important points with regard to our decision today that I believe require further elaboration.

*First, this case involves the respondent's reasonable fear that she faces the possibility of harm or abuse, rising to the level of persecution, inflicted on account of her membership in a particular social group.*

This case falls squarely within the formulation adopted by Congress in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which was enacted in large part to establish compliance with this country's domestic and international humanitarian obligations under the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967 [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268, to which the United States is a signatory country, and which incorporates by reference the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Convention"). *See* sections 208, 243(h) of the Act, 8 U.S.C. §§ 1158, 1243(h) (1994). As I read the record, both the Service and the applicant call upon us, in their briefs and at oral argument, to recognize and articulate a framework to provide a context for our decision in this case. However, unlike the Service, which urges us to consider a new standard and a new framework which exceeds the bounds of this case (Service Brief at 12-15; O.A. at 26), the applicant contends that we should draw on traditional principles of asylum jurisprudence to adopt a framework that is consistent and appropriate with the Refugee Act and international law. (Applicant's Brief at 27-36, Applicant's Reply Brief at 13-15, O.A. at 4). I agree.

In my view, there are three essential elements inherent in our definition of persecution, which, if established, constitute the basis for a discretionary grant of asylum, or a mandatory grant of withholding of deportation, or both. One is the factor of the applicant's genuine, subjective fear of persecution, which must be accompanied by objective evidence rendering the fear reasonable. The next is the factor of harm, abuse, or ill-treatment which rises to the

level of, or amounts to, persecution and includes consideration of the applicant's attitude towards such treatment. The last is the reason for, or cause of, the infliction of persecution. This is known as the "on account of" factor, which includes consideration of the motives of the agent of persecution and requires a nexus between the infliction of harm which constitutes persecution and one of the five protected grounds or statuses, such as social group membership, set forth by the Act. In *Fatin v. INS,* 12 F.3d 1233, 1240 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit held that to prevail, an applicant claiming social group persecution must identify a cognizable social group, establish her membership in it, and show that persecution is based on that membership.

In this case, I conclude that the applicant's fear is of imminent female genital mutilation, related to being forced to enter an arranged marriage, documented in the record as constituting a mandatory tribal custom. The harm or abuse amounting to persecution is the genital mutilation opposed by the applicant. The reason the persecution would be inflicted, the "on account of" element, is because of the persecutor's intent to overcome her state of being non-mutilated and accordingly, free from male-dominated tribal control, including an arranged marriage.

I see no reason to depart from our existing jurisprudence in order to determine the claim set forth here. In my view, this issue is controlled by our precedent decisions, interpreting the statute and agency regulations, in which, only recently, we have recognized that government-tortured Sri Lankans; imprisoned and beaten Somalia tribesmen; persecuted Afghani Mujahedin fighters; and Haitian women, raped for political retribution, can set forth claims which deserve and warrant protection within our laws. *Matter of H-*, 21 I&N Dec. 337 (BIA 1996); *Matter of D-V-*, 21 I&N Dec. 77 (BIA 1993); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995).

In adjudicating any asylum claim, we use a "reasonableness" standard to determine whether an asylum applicant has established the presence of these essential elements. *See INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (addressing the distinct burdens of proof for asylum, requiring that the applicant's fear be reasonable, and for withholding of deportation, requiring that there be a likelihood or clear probability of persecution). In my view, while *Cardoza-Fonseca* and its progeny, including our decision in *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), invoked that standard principally to assess the fear of persecution asserted by the applicant, it is equally appropriate to employ that standard in our determinations regarding the "on account of" element.

In this case, the applicant has met her burden of establishing that her fear of female genital mutilation is not only reasonable, but that its infliction on her is probable. In addition, she has shown this practice to be persecution since she has met her burden of establishing that it is both reasonable to believe and probable that the mutilation she faces is on account of her status

as a young woman of the tribe, that she opposes the practice of mutilation, and that it will be inflicted in satisfaction of tribal customs or norms because of her status.

*Second, a social group definition that takes into account and differentiates the other component elements of the definition of persecution which warrant protection under United States law is critical.*

There is nothing about a social group definition based upon gender that requires us to treat it as either an aberration, or as an unanticipated development requiring a new standard. While this is the first time that this Board has addressed the particular type of harm or abuse feared by the respondent—female genital mutilation—it is not the first time that the Board has addressed the "particular social group category," *see, e.g., Matter of Sanchez and Escobar*, 19 I&N Dec. 276 (BIA 1985); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi, supra*. Indeed, this Board has specifically addressed the category of particular social group persecution in a recent decision. *Matter of H-, supra* (holding that membership in an identifiable subclan of a Somalian tribe constitutes membership in a particular social group and that harm suffered on account of that membership constitutes persecution).

The social group category within the refugee definition incorporated into the Act has been recognized as having deliberately been included as a "catch-all" for individuals not falling into the first four specifically enumerated categories of political opinion, race, religion, or ethnicity. *See* Kristin E. Kandt, *United States Asylum Law: Recognizing Persecution Based on Gender Using Canada as a Comparison*, 9 Geo. Immigr. L.J. 137, 145 (1995) (citing T. Alexander Aleinikoff, *The Meaning of "Persecution" on United States Asylum Law,* 3 Int'l J. Refugee L. 5, 11 (1991); *see also* Nancy Kelly, *Guidelines for Women's Asylum Claims*, 26 Cornell Int'l L.J. 625 (1993); Pamela Goldberg, *Anyplace But Home: Asylum in the United States for Women Fleeing Intimate Violence,* 26 Cornell Int'l L.J. 565, 591-92 (1993). As Professor Goldberg discusses, the scope of the social group category has been addressed by preeminent international law scholars. For example, Atle Grahl-Madsen considers it to be broader than the other categories and to have been added to the Convention precisely to protect against persecution that would arise from unforeseeable circumstances. In addition, Guy Goodwin Gill asserts that the category allows states to expand it to various classes susceptible to persecution. In her article, Professor Goldberg proposes one definition of a gender-identified social group which would include a group of women characterized by circumstances or similar treatment, not unlike the definition we propose here.

Unlike requests for asylum premised upon political opinion, social group claims, like those involving race, ethnicity, or religion, are status based and do not necessarily require a showing of the presence of an individual's opinions or activities which spurs the persecutor's wrath or otherwise motivates

the harm or persecution. *Matter of H-, supra*. Rather, such requests involve a determination of whether the shared characteristics are those which motivate an agent of persecution to seek to overcome or otherwise harm the individual. *Matter of Acosta, supra*. Consequently, while not inaccurate, it is surplusage to define the social group in this case by including as an element the applicant's opposition to the practice of female genital mutilation.

It may be true that sometimes an individual woman's political opinion may overlap or coexist with her membership in a group designated as a particular social group; however, that does not detract from the fact that social group membership is a status-based ground protected under the Act, just as is religion or ethnicity. While it is not impossible that a political or social opinion, either actual or imputed, may be shared by persons whom, as a result, we would characterize as constituting a particular social group within the meaning of the Act, that is not the case here. As I have stated, the applicant's political or social views—her attitude or intent—is not relevant to our definition of the social group to which she belongs, but rather to whether the harm or abuse she faces constitutes persecution.

In *Matter of H-, supra*, this Board found, without difficulty or the need to qualify, that a man who was a member of a tribe in Somalia whose members were being systematically attacked by other tribes in retribution for the corruption and brutality of former ruler and tribe member, Siad Barre, had established persecution based on his clan membership alone. That his father and brother were killed and that he himself was brutally treated during detention was found to be persecution on account of his membership in a subclan in Somalia, a particular social group. His attitude towards that persecution was neither examined nor relevant.

The only distinguishing characteristic about this case that I can perceive to set it apart from others we already have decided is that it involves a woman. Reliance upon such a distinction to support a separate category for treatment of women's asylum claims, to my mind, would be impermissible. *See, e.g.,* Kandt, *supra*, at 143-151. Here, the applicant is a member of a group: girls and women of a given tribe, some perhaps of marriageable age, whose members are routinely subjected to the harm which the majority finds to constitute persecution. The applicant's opposition (which happens to be present in this case) or the lack of it, is neither determinative, nor necessary to define the social group in accordance with the statutory language.

*Third, it is the role of this Board to interpret and apply the statute in individual cases coming before us for the purpose of establishing a consistent framework for adjudication.*

This Board has a significant history and an ongoing role in interpreting the statute and determining the law in cases involving immigrants and refugees. Under 8 C.F.R. § 3.1(g) (1995), our precedent decisions are to be binding on all subsequent adjudications involving the same issue or issues. As the designee of the Attorney General, we serve not only to adjudicate individual,

unrelated cases on their facts, but also to give life to the provisions and terms of the law and establish agency policy through adjudication. *See Rust v. Sullivan,* 500 U.S. 173 (1991); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (finding that administrative agencies may engage in setting policy both by rulemaking and case adjudication).

Consideration of gender-based, or gender-related, asylum claims within the "membership in a particular social group" construct that exists within the Act is entirely appropriate and consistent with the developing trend of jurisprudence in the United States and Canada as well as with international norms. *Fatin v. INS, supra; Cheung v. Canada*, 102 D.L.R. 4th 214 (1993); *cf. Gomez v. INS*, 947 F.2d 660 (2d Cir. 1991). Further, the United Nations High Commissioner for Refugees explicitly encourages the use of "particular social group" analysis to extend protection to women asylum seekers who otherwise satisfy the refugee definition. *See* United Nations High Commissioner for Refugees, *Memorandum: Female Genital Mutilation* (Geneva, UNHCR, Division of International Protection, May 1994). Our recognition of a particular social group based upon tribal affiliation and gender is also in harmony with the guidelines for adjudicating women's asylum claims issued by the Service, *see* Coven, U.S. Dep't of Justice, *Considerations for Asylum Officers Adjudicating Asylum Claims From Women* (1995), and with the Canadian guidelines for women refugees facing gender-related persecution, *see* Immigration and Refugee Board, *Guidelines Issued by the Chairperson Pursuant to Section 65(B) of the Immigration Act: Women Refugee Claimants Fearing Gender-Related Persecution* (1993) ("Canadian gender guidelines").

In an endorsement of the viability of the present statutory structure, the Service itself saw fit to develop gender guidelines to assist in the adjudication of asylum claims brought by women. *Coven, supra.* Curiously, the position of the Service in this case makes no reference to its published guidance in that regard. However, it is notable that the guidelines recognize the importance of considering gender-based claims in light of international human rights instruments and the framework they provide. Indeed, the Service itself recognizes that gender-based asylum claims are "developments in refugee protection" and that its guidelines are a natural and multifaceted outgrowth of a set of gender guidelines issued by the UNHCR in 1991, the 1993 Canadian gender guidelines and other sources of expertise including the Women's Refugee Project of the Harvard Immigration and Refugee Program.

What we have done here, while we do not explicitly say so, is to posit, by example, the proper framework in which the individual facts of such claims made before the Service and before Immigration Judges should be considered and judged. In sum, we have, in the majority opinion, set forth a road map for analysis appropriate for this case, which may easily be extrapolated and applied in upcoming adjudications, not only of gender-based asylum claims, but in many other asylum applications. Moving from the factual

assertions in the applicant's testimony concerning her fear, and the practice of female genital mutilation in her tribe, we have considered the background information presented, including her application and documentation submitted as other exhibits in support of it. Taking this evidence as a whole, we found the applicant to have testified truthfully, and we rejected both the Immigration Judge's finding that the applicant's claim lacked "rationality" and his reliance on minor inconsistencies pertaining to tangential matters which were reasonably explained and did not, in any event, go to the essence of her claim.

As it was raised by the Service and addressed in our case law, *Matter of R-,* 20 I&N Dec. 621 (BIA 1992), we looked to whether or not the applicant could reasonably be expected to relocate within the country of Togo, and we found her to have established a country-wide basis for her fear. Finally, in exercising our discretion, we rejected the Immigration Judge's contention that the applicant had an obligation to seek refuge in other countries she passed through while in transit to the United States. We reaffirmed that use of a false passport to travel to this country is outweighed by the danger of persecution, *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), and granted asylum. All of this was clearly, coherently, and properly done based on the facts presented in this case and on the existing statute, related policy considerations, and developing legal authorities consistent with the current law.

*DISSENTING OPINION:* Fred W. Vacca, Board Member

I respectfully dissent without opinion.