PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MAHAMAN HAOUA,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 05-2181

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A97-622-225)

Argued: October 25, 2006

Decided: January 5, 2007

Before KING, GREGORY, and SHEDD, Circuit Judges.

Petition for review granted in part and remand awarded by published
opinion. Judge King wrote the opinion, in which Judge Gregory and
Judge Shedd joined.

## COUNSEL

**ARGUED:** Kell Enow, Silver Spring, Maryland, for Petitioner. Dan-
iel Eric Goldman, UNITED STATES DEPARTMENT OF JUSTICE,
Office of Immigration Litigation, Washington, D.C., for Respondent.
**ON BRIEF:** Patrick G. Tzeuton, LAW OFFICES OF PATRICK
TZEUTON & ASSOCIATES, Silver Spring, Maryland, for Peti-
tioner. Chuck Rosenberg, United States Attorney, Mark A. Exley,
Assistant United States Attorney, Norfolk, Virginia, for Respondent.

**OPINION**

KING, Circuit Judge:

Haoua Mahaman has petitioned for our review of the Order of the Board of Immigration Appeals (the "BIA"), issued September 26, 2005, that she be removed to Niger, her country of origin (the "BIA Order"). *See* BIA Order 1 (J.A. 3).[1] Mahaman contends that there was a lack of substantial evidence to support the finding of the Immigration Judge (the "IJ") that she had only a 10% chance of undergoing female genital mutilation ("FGM") if she returned to Niger.[2] She maintains that the IJ therefore erred, in his Order of June 1, 2004 (the "IJ Order"), in denying her applications for asylum under 8 U.S.C. § 1158(b), withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under the United Nations Convention Against Torture (the "CAT"). *See* IJ Order 9-11 (J.A. 16-18).[3] As explained below, we grant Mahaman's petition for review in part and remand.

I.

A.

Mahaman is a forty-year-old native and citizen of Niger. She first entered the United States on September 12, 1999, on the basis of a student visa.[4] She had previously received a degree from the Univer-

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[2] Although the style of this case, as presented by the parties, names the petitioner as "Mahaman Haoua," it appears from the record that her correct name is "Haoua Mahaman." We thus refer to her as "Mahaman."

[3] The BIA Order of September 26, 2005, affirmed, without opinion, the IJ Order of June 1, 2004, and specified that the IJ Order constitutes the final agency determination in this matter. *See* 8 C.F.R. § 1003.1(e)(4) (establishing procedure for BIA affirmance without opinion). Accordingly, we treat the IJ's reasoning as that of the BIA for purposes of our review. *See Camara v. Ashcroft*, 378 F.3d 361, 366 (4th Cir. 2004) ("[W]hile we review the BIA's final order for correctness, we review the IJ's decision for the reasoning . . . .").

[4] The factual predicate of this appeal is drawn from the record below. Like the IJ, we rely largely on Mahaman's testimony, which the IJ specifically found to be credible. *See* IJ Order 8 (J.A. 15).

sity of Niamey in Niger, and planned to continue her education in the United States. Between 1999 and 2002, Mahaman resided in Riverside, California, and Burlington, North Carolina. During that period, she studied English and computer technology, and worked as a lab technician.

In 2002, Mahaman came under pressure from her parents in Niger to return home and marry. In August 2002, she made a trip to Niger, hoping to dissuade her parents from their position in that regard. When she arrived at her parents' home, she discovered that they had already arranged for her to marry the elderly chieftain of a nearby village, and that, in keeping with the custom of the Hausa — the ethnic group of which she is a member — she would be forced to undergo FGM before marrying the chieftain.[5] Mahaman concluded that she could not deter her family from enforcing the marriage agreement and subjecting her to FGM, and she returned to the United States after only three weeks in Niger. An uncle who lives in Niamey, the Nigerien capital, assisted Mahaman in her departure.

In February 2003, Mahaman, who was then in the United States, received a letter from her brother, who lived in Niger, informing her that, in her absence, her family had accepted a large dowry as consideration for their promise that she would marry the chieftain, and that a wedding ceremony had been conducted in her absence. Her brother's letter advised Mahaman that she was to undergo FGM before joining her husband's household, and that her husband was growing

---

[5]Female genital mutilation, commonly called FGM, is the designation generally given to a class of surgical procedures involving the removal of some or all of the external genitalia, performed primarily on girls and young women in Africa and Asia. *See Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004). Often performed under unsanitary conditions with highly rudimentary instruments, FGM is "extremely painful," "permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications," including "bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus." *In re Kasinga*, 21 I. & N. Dec. 357, 361 (B.I.A. June 13, 1996); *see also Abay*, 368 F.3d at 638. FGM can result in the permanent loss of genital sensation in the victim and can adversely affect sexual function. *See Kasinga*, 21 I. & N. Dec. at 361.

impatient for her arrival. Mahaman responded that she would not return to Niger under those circumstances. Her brother insisted, however, that she was already married to the chieftain — whether she liked it or not — and that, because her family had accepted so much money in exchange for her, they were not in a position to renege.

According to Mahaman, the communications with her brother convinced her that she could not safely return to Niger. The student visa on which she had originally entered the United States, however, was no longer valid, and she was consequently subject to removal to her home country. Thus, on August 18, 2003, she applied to the United States Citizenship and Immigration Services for asylum, withholding of removal, and relief under the CAT, asserting that she feared persecution and torture — in the form of FGM — if she returned to Niger.

B.

On June 1, 2004, the IJ conducted a hearing on Mahaman's application. The primary evidence presented at the hearing was Mahaman's testimony, which the IJ found to be credible. Mahaman testified that her family would force her to undergo FGM if she returned to Niger. As additional support for this contention, she submitted the State Department's Country Report on Human Rights Practices in Niger, dated February 25, 2004, which indicated that approximately one in five Nigerien women is forced to undergo FGM, and that the practice persists among certain ethnic groups despite a new law criminalizing it. Mahaman testified that her ethnic group continues to practice FGM, requiring the procedure to be performed before a woman is married. She also testified that the Nigerien government's efforts to suppress FGM have been ineffective in the rural areas of the country, including the region in which her family resides. Despite this evidence, the IJ found that Mahaman had only "at least a 10 percent chance" of suffering FGM if she returned to her family in Niger. IJ Order 9 (J.A. 16). The IJ failed to explain, however, how he had identified "at least" 10% as the likelihood that Mahaman would be subjected to FGM.

The IJ also considered the possibility that Mahaman could avoid persecution by relocating within Niger. He found that internal relocation within Niger was a feasible alternative for Mahaman, given her

level of education and the support she had received from her uncle in Niamey. Then, having determined that relocation was feasible, the IJ assessed whether the protection Mahaman could obtain by relocating was sufficient to overcome her risk of suffering FGM if she did not relocate. At this stage of his analysis, the IJ regarded Mahaman's risk of suffering FGM as simply 10% (the "10% finding"), rather than his earlier finding of "at least" 10%. The IJ concluded that Mahaman's "reasonably available internal relocation alternative overcomes the 10 percent fear of FGM at the hands of her family," and on that basis denied her application for asylum. IJ Order 9-10 (J.A. 16-17).

The IJ also denied Mahaman's application for withholding of removal, explaining that, "[a]s stated earlier, I find that under all of the circumstances it is highly unlikely that the respondent will suffer FGM in Niger, particularly since she can reasonably relocate to avoid it." IJ Order 10 (J.A. 17). Finally, the IJ denied Mahaman's application for relief under the CAT, repeating his finding that she was unlikely to suffer FGM, and adding that, if she did, it would occur without the acquiescence of the Nigerien government. *Id.* at 10-11 (J.A. 16-17).

On September 26, 2005, the BIA affirmed the IJ Order without opinion. *See* BIA Order 1 (J.A. 3). Mahaman has petitioned for our review of the BIA Order, and we possess jurisdiction pursuant to 8 U.S.C. § 1252.

II.

A BIA decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law. 8 U.S.C. § 1252(b)(4)(C). We review the BIA's administrative findings of fact under the substantial evidence rule, and we are obliged to treat them as conclusive unless the evidence before the BIA was such that any reasonable adjudicator would have been compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Because the BIA Order affirmed the IJ Order without opinion, and specified that the IJ Order constitutes the final agency determination in this matter, we treat the reasoning of the IJ Order as that of the BIA for purposes of our

review. *See* 8 C.F.R. § 1003.1(e)(4); *Camara v. Ashcroft*, 378 F.3d 361, 366 (4th Cir. 2004).

## III.

## A.

The legal framework for this appeal is established by the Immigration and Nationality Act, 8 U.S.C. §§ 1101-1537 (the "Act"), and the regulations implementing it. An alien is eligible for asylum if she demonstrates that she is unable or unwilling to return to her country of origin because of persecution, or a well-founded fear of persecution, on account of her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Asylum is not available, however, if the alien can avoid persecution by relocating within her country of origin. 8 C.F.R. § 1208.13(b)(2)(ii). We have heretofore recognized that "FGM constitutes persecution within the meaning of the [Act]," and the Attorney General does not contend otherwise in this proceeding. *Barry v. Gonzales*, 445 F.3d 741, 745 (4th Cir. 2006) (citing *Mohammed v. Gonzales*, 400 F.3d 785, 796 (9th Cir. 2005) ("[T]he extremely painful, physically invasive, psychologically damaging and permanently disfiguring process of genital mutilation undoubtedly rises to the level of persecution."); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004) ("Forced female genital mutilation involves the infliction of grave harm constituting persecution on account of membership in a particular social group that can form the basis of a successful claim for asylum."); *Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir. 1999) ("That FGM involves the infliction of grave harm constituting persecution . . . is not disputed here.")); *see also In re Kasinga*, 21 I. & N. Dec. 357, 365 (B.I.A. June 13, 1996) (concluding that FGM constitutes persecution within meaning of Act).

Withholding of removal under 8 U.S.C. § 1231(b)(3) is available to an alien who shows that it is more likely than not that her life or freedom would be threatened in the proposed country of removal because of her race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(2). Relief under the CAT (which also takes the form of withholding of removal) requires a demonstration that the

applicant is more likely than not to be tortured in the proposed country of removal. *See* 8 C.F.R. § 208.16(c)(2). For purposes of the CAT, torture includes only conduct "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 208.18(a)(1).

B.

Mahaman first assigns as error the IJ's 10% finding, maintaining that it was not supported by substantial evidence. She contends that the IJ's erroneous 10% finding caused him to err in denying her applications for asylum, withholding of removal, and protection under the CAT.

We are compelled to agree with Mahaman that the 10% finding was not supported by substantial evidence. Indeed, the Attorney General conceded this very point during oral argument, acknowledging that, contrary to the IJ's finding, if Mahaman returned to her family, her likelihood of suffering FGM would approach 100%. The Attorney General's concession in this regard is admirable, and it is entirely consistent with the evidence — including Mahaman's testimony (which the IJ deemed credible) that her family had, in effect, sold her to her chieftain husband, and that the transaction would, upon her return to Niger, force her to undergo FGM and assume her place as his wife. The 10% finding of the IJ, by contrast, was necessarily premised on speculation and conjecture, in that there was no evidentiary basis for it.

The Attorney General maintains, however, that we should affirm the BIA and IJ Orders despite the erroneous 10% finding, because the IJ's subsequent finding that Mahaman could relocate in Niger to avoid FGM constitutes an independent basis for the IJ's denial of relief on her application. The problem with the Attorney General's position is that the IJ's finding regarding relocation was specifically predicated on the 10% finding. Indeed, the IJ decided that Mahaman's "reasonably available internal relocation alternative *overcomes* the 10 percent fear of FGM at the hands of her family." IJ Order 10 (J.A. 17) (emphasis added). The IJ did not, however, consider whether Mahaman's relocation alternative could overcome a risk of FGM greater than 10% — much less a risk approaching 100%. Rather, he analyzed

the relocation issue solely on the basis of his 10% finding. Because the 10% finding was erroneous, the IJ's determination that Mahaman could avoid FGM by relocating within Niger was not supported by substantial evidence. And, because the IJ's analysis of Mahaman's relocation alternative was the reason her asylum application was denied, that portion of the IJ Order must be vacated.

### C.

Mahaman also contends that, as a result of the IJ's erroneous 10% finding, the IJ erred in denying her applications for withholding of removal under § 1231(b)(3) and for relief under the CAT. We agree with the first of these two contentions, relating to her application for withholding of removal. The IJ denied withholding of removal based on his earlier analysis of Mahaman's asylum application. As explained above, the IJ's findings on the asylum issue are not supported by substantial evidence, and those same findings were used to support his ruling regarding the application for withholding of removal. As a result, that aspect of the IJ Order must also be vacated.

We are obliged to reach a contrary conclusion, however, on Mahaman's application for protection under the CAT. In denying Mahaman's CAT application, the IJ relied not only on the erroneous 10% finding, but also on his determination that, if Mahaman did undergo FGM, it would not be with the consent or acquiescence of the Nigerien government. It is clear that CAT relief is available only to avoid "pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (defining torture for purposes of CAT); *see also Lopez-Soto v. Ashcroft*, 383 F.3d 228, 239-41 (4th Cir. 2004) (denying CAT relief where torture was more likely than not to occur, but would not involve government acquiescence). Mahaman does not, in this proceeding, challenge the IJ's finding on that crucial point — that if she suffered FGM upon her return to Niger, it would not be with the acquiescence of Nigerien government officials. We thus deny the petition for review with regard to Mahaman's application for relief under the CAT.

### IV.

Pursuant to the foregoing, we grant Mahaman's petition for review insofar as it challenges the denial of her application for asylum and

withholding of removal, and we vacate the BIA and IJ Orders with regard thereto. We remand those aspects of this matter to the BIA for such further proceedings as may be appropriate. On the other hand, we deny Mahaman's petition with respect to her application for relief under the CAT.

*PETITION FOR REVIEW GRANTED*
*IN PART AND REMAND AWARDED*