PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FRANCOISE ANATE GOMIS,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

No. 08-1389

On Petition for Review of an Order of the
Board of Immigration Appeals.

Argued: March 25, 2009

Decided: July 6, 2009

Before NIEMEYER and GREGORY, Circuit Judges, and
Eugene E. SILER, Jr., Senior Circuit Judge of the United
States Court of Appeals for the Sixth Circuit,
sitting by designation.

Petition denied by published opinion. Judge Niemeyer wrote
the opinion, in which Senior Judge Siler joined. Judge Greg-
ory wrote a separate opinion concurring in part and dissenting
in part.

## COUNSEL

**ARGUED:** Kell Enow, ENOW & PATCHA, Silver Spring,
Maryland, for Petitioner. Andrew B. Insenga, UNITED

STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent. **ON BRIEF:** Gregory G. Katsas, Assistant Attorney General, Civil Division, M. Jocelyn Lopez Wright, Assistant Director, UNITED STATES DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent.

---

**OPINION**

NIEMEYER, Circuit Judge:

Francoise Anate Gomis, a native and citizen of Senegal, petitions for review of an order of the Board of Immigration Appeals (BIA) that affirmed the decision of the immigration judge denying her applications for asylum, withholding of removal, and relief under the Convention Against Torture. Gomis contends (1) that even though her asylum application was not filed within the one-year statutory deadline, the BIA erred in finding that she had not demonstrated changed or extraordinary circumstances that excused the delay and (2) that the BIA's finding that it is not more likely than not that Gomis will be subjected to female genital mutilation if returned to Senegal is not supported by substantial evidence and thus the BIA's denial of withholding of removal is manifestly contrary to law.

For the reasons that follow, we conclude that we lack jurisdiction to review the BIA's determination that Gomis did not meet the changed or extraordinary circumstances exception and that the BIA's findings underlying its denial of withholding of removal are supported by substantial evidence. Accordingly, we deny Gomis' petition for review.

I

Gomis arrived in the United States on January 30, 2001, coming to work as a nonimmigrant domestic servant for an

employee of the International Monetary Fund. She was authorized to remain in the United States until April 30, 2003. Over two years later, in June 2005, Gomis filed an application for asylum in which she claimed that she fled Senegal because her family wanted her to undergo female genital mutilation (FGM or circumcision) and participate in an arranged marriage. After the Department of Homeland Security refused to grant Gomis' application, it issued a notice to appear on July 27, 2005, for removal proceedings and referred the matter to an immigration judge. At the hearing before the immigration judge, Gomis admitted removability and renewed her application for asylum, withholding of removal, and protection under the U.N. Convention Against Torture.

At the hearing before the immigration judge, Gomis testified that she was born in 1978 in Dakar, Senegal, and lived with her family in the outskirts of Dakar. She is single and does not have any children. Gomis and her family are members of the Djola ethnic group, which still practices FGM, and her father, who is a businessman, has two wives, both of whom are circumcised.

Relating her circumstances, Gomis testified that in June 1999, her parents took her from school so that she could undergo FGM and become married to a man in his sixties. In exchange for this marriage commitment, her parents accepted gifts from the man. Because Gomis desired to finish school and retain her independence, she went to the police to report her parents' intentions, but the police told her to return home and try to resolve the problem. When Gomis informed her uncle, who lives in France, of the situation, he tried to persuade her father, unsuccessfully, to allow Gomis to return to school. On her uncle's advice, Gomis obtained a passport and left home in November 2000, initially hiding at a friend's house in Senegal. After Gomis obtained a visa at the embassy, one of her uncle's friends drove her to the airport to leave Senegal. Once in the United States, Gomis worked for an employee of the International Monetary Fund for three years.

While in the United States, Gomis learned that her parents had forced her 15-year-old sister to undergo FGM before marriage and that when Gomis' brother filed a complaint with the police, he was told to go home.

Gomis gave her opinion that 80 to 100% of the Djola women have undergone FGM and have been forced to marry older men. According to Gomis, when a woman's parents were ready to have her undergo FGM, they would come to her room with other family members when she was asleep and take her away. She noted that some families have FGM performed on their daughters when they are young, while other families wait until just before their daughters' marriage.

She acknowledged, however, that the Senegalese government is against the practice. Yet, families continue the practice of performing FGM because of tradition. Gomis stated that because her family wanted her to undergo FGM, there was nowhere in Senegal she could live without fear of being subjected to it. She stated that her family is widely dispersed throughout Senegal and that the country is small, where everyone knows each other.*

Gomis submitted a letter from her sister dated September 12, 2006, stating that she underwent FGM in February 2005 and that as a result she became infected and still suffers persistent pain. According to her sister, Gomis' father is still angry with Gomis and wants her to return home.

In addition, Gomis presented other letters and documents confirming some of her testimony. She submitted her sister's medical file documenting her sister's visit to the doctor with medical complications after the circumcision; an attestation from her uncle stating that he helped Gomis leave Senegal to

---

*The population of Senegal is over 12 million people with more than 1 million living in Dakar proper and some 2.5 million living in the Dakar metropolitan area.

go to the United States; an attestation from the person who hired Gomis as a domestic servant, claiming that Gomis' uncle arranged for the employment; a letter sent to Gomis from her aunt in Senegal, who stated that her fiance provided a dowry and that all the other women her age have been circumcised; a letter from her mother telling her that she cannot avoid customs, that her fiance is losing patience with her, and that the entire village is laughing at her family; a letter from her father ordering her to return home so that she can be circumcised and marry her fiance; and finally a letter from her uncle stating that he had seen her parents, and they had not changed their minds and continue to want Gomis to undergo the procedure.

The Department of State's report on FGM in Senegal, dated June 1, 2001, which was entered into the record, states that FGM is most common among Muslim groups in the eastern part of the country, but that most Senegalese women have not undergone the procedure and that it is becoming less common due to urbanization and education. The report refers to a study published in 1988, which found that only 20% of Senegalese women have undergone the procedure and which noted that other estimates place the figure between 5 and 20%. The report related that FGM is hardly practiced in populated urban areas. Regarding Gomis' ethnic group, the Djolas, the report states that rural elements of the Djola group practice FGM as a puberty initiation rite. For all of Senegal, 90% of the women who had undergone the procedure were between two and five years old at the time of the procedure, but for others it was part of a puberty initiation rite.

In 1998, Senegal's president called for the eradication of FGM, and since 1999, there have been programs and seminars to educate the public about it. Many rural villages have issued declarations against the practice. In January 1999, Senegal enacted a law criminalizing FGM with a sentence of one to five years' imprisonment. The report added that there had been no convictions under this law, and, because many of

those circumcised were very young, they were not in a position to report violations.

Gomis also included in the record a State Department report on human rights conditions in Senegal, issued in March 2006, which stated that FGM was practiced in thousands of rural villages. It estimated that nearly 100% of the women in the northern Fouta region were FGM victims and that nearly 60-70% of the women in the south and southeast were. The report confirmed that FGM is a criminal offense, carrying a sentence of six months to five years' imprisonment, and stated that there have been criminal prosecutions under the law. In addition, the report noted that 140 villages have renounced FGM but nonetheless, many people were still practicing it.

In denying Gomis relief, the immigration judge found that Gomis was "genuinely credible" but that Gomis' opinion testimony regarding the prevalence of FGM, both in general and within her ethnic group, was at odds with the State Department reports. The judge allowed that this could be the result of Gomis' lack of knowledge of the actual facts, "rather than an effort to deceive."

The immigration judge also found Gomis' asylum application untimely because it was filed more than one year after she entered the United States and Gomis did not establish changed or extraordinary circumstances warranting an extension of the filing period. Gomis' evidence about her sister's circumcision, on which Gomis relied to prove changed circumstances, merely confirmed the condition Gomis claimed existed when she left Senegal.

The immigration judge further found that Gomis did not meet her burden of establishing that it was more likely than not that she would face FGM if she returned to Senegal. The judge allowed that there was "some small chance, perhaps what even amount[s] to a reasonable possibility" that Gomis will become a victim of the practice, but not a more-likely-

than-not chance. The judge found that most Senegalese women have not undergone the procedure; that the practice is becoming less common in Senegal; and that it is rarely practiced in urban areas. In addition, the judge found that the "mostly rural elements of the Djola" groups who practice FGM do so "as a puberty initiation rite," but Gomis was well past the age of puberty, and she "lived in Dakar, a very large city." The judge noted that FGM is a criminal offense in Senegal and that the government has begun prosecuting people for the offense. Moreover, because Gomis was 28 years old and "relatively well-educated," she "would be better able to relocate in a safe place in Senegal than [would] a younger or less educated" woman. Accordingly, the judge denied Gomis' petition to withhold removal, stating that "based on a totality of the record of evidence in the case I simply cannot conclude that [Gomis] has met her burden of proof of establishing that it is more likely than not she would be subjected to this horrible practice."

With respect to relief under the Convention Against Torture, the immigration judge found that even if FGM constituted torture, it was not more likely than not that Gomis will be subjected to it. And moreover, any risk that Gomis faces from her family is not with the consent or acquiescence of the Senegalese government.

The BIA affirmed the immigration judge's determinations. It agreed that Gomis "failed to meet her burden of establishing that it is objectively more likely than not that she would be subjected to [FGM] if returned to Senegal." The BIA found that FGM is becoming less common in Senegal and is rare in large urban areas. In addition, it found that FGM is criminalized by the government of Senegal; that there are prosecutions under the law; and that the government has collaborated with groups to educate the public on the inherent dangers of the practice. The BIA also found that 90% of the women who undergo FGM in Senegal are between the ages of two and five. Because Gomis was 28 years old, she might have a sub-

jective fear of undergoing FGM upon returning to Senegal, but the BIA found that the record does not objectively support that it is more likely than not that she would have to undergo the procedure. The BIA thus upheld the denial of withholding of removal. And finally, the BIA upheld the denial of relief under the Convention Against Torture.

From the BIA's order, Gomis petitions this court for review.

## II

Gomis contends first that even though she did not file her application for asylum within one year of the date of her arrival in the United States, as required by 8 U.S.C. § 1158(a)(2)(B), "she meets both the extraordinary circumstances and changed circumstances exception[s]" of 8 U.S.C. § 1158(a)(2)(D). Gomis claims that she did not file within one year because she believed that with the passage of criminal laws prohibiting FGM in Senegal, the practice would change. She argues that when her sister had the procedure performed on her in 2005 and the police failed to respond, she realized she was in danger of FGM if she returned to Senegal.

The immigration judge found that the FGM performed on Gomis' sister in February 2005 did not constitute either extraordinary or changed circumstances under 8 U.S.C. § 1158(a)(2)(D) because the threat of FGM was the very reason Gomis claims to have left Senegal in 2001, and the BIA "[found] no error in the Immigration Judge's decision for the reasons stated therein."

An alien applying for asylum must show "by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). An asylum application may be considered after one year "if the alien demonstrates to the satisfaction of the Attorney General either the existence of

changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified." *Id.* § 1158(a)(2)(D). But 8 U.S.C. § 1158(a)(3) provides that "[n]o court shall have jurisdiction to review *any* determination of the Attorney General under paragraph (2)," which includes both the Attorney General's decision whether an alien has complied with the one-year time limit *and* whether there are changed or extraordinary circumstances excusing the delay. *Id.* § 1158(a)(3) (emphasis added).

Thus, under the express language of § 1158(a)(3), we lack jurisdiction to review the immigration judge's determination. *See Zaidi v. Ashcroft*, 377 F.3d 678, 680-81 (7th Cir. 2004) (holding that the jurisdiction-stripping provision of 8 U.S.C. § 1158(a)(3) precludes review of the immigration judge's determination that the alien had not demonstrated "changed circumstances" or "extraordinary circumstances" under 8 U.S.C. § 1158(a)(2)(D) and collecting cases).

Although 8 U.S.C. § 1252(a)(2)(D), added by the REAL ID Act of 2005, provides that "[n]othing . . . in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law," the question whether the changed or extraordinary circumstances exception applies to excuse an alien's delay in filing her asylum application is a *discretionary determination* based on factual circumstances. Therefore, absent a colorable constitutional claim or question of law, our review of the issue is not authorized by § 1252(a)(2)(D). Nearly every circuit that has analyzed § 1158(a)(3) in light of § 1252(a)(2)(D) has held that even after the REAL ID Act, the federal courts continue to lack jurisdiction over the determination whether the alien demonstrated changed or extraordinary circumstances that would excuse an untimely filing. *See, e.g.*, *Jarbough v. Attorney Gen.*, 483 F.3d 184, 188-90 (3d Cir. 2007); *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006); *Almuhtaseb v. Gon-*

*zales*, 453 F.3d 743, 747-48 (6th Cir. 2006); *Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 154-55 (2d Cir. 2006); *Mehilli v. Gonzales*, 433 F.3d 86, 92-94 (1st Cir. 2005); *Ignatova v. Gonzales*, 430 F.3d 1209, 1214 (8th Cir. 2005); *Chacon-Botero v. U.S. Attorney Gen.*, 427 F.3d 954, 956-57 (11th Cir. 2005) (per curiam); *Vasile v. Gonzales*, 417 F.3d 766, 768-69 (7th Cir. 2005). *But see Ramadan v. Gonzales*, 479 F.3d 646, 649-54 (9th Cir. 2007) (per curiam) (finding jurisdiction to review whether an alien has demonstrated "changed circumstances" to excuse a late asylum application, characterizing the issue as a mixed question of law and fact).

We join the majority of courts who have reached this issue and hold that we lack jurisdiction to review the immigration judge's discretionary determination, as affirmed by the BIA, that Gomis had not demonstrated changed or extraordinary circumstances to excuse her untimely filing.

### III

Gomis also contends that the BIA's finding that it is not more likely than not that Gomis will be subjected to FGM if she is returned to Senegal "is speculative and not based on the substantial evidence in the record." She argues that there "is clear evidence in the record that she will be excised if she were to return to Senegal" and therefore that the BIA's denial of withholding of removal is manifestly contrary to law.

Withholding of removal is available under 8 U.S.C. § 1231(b)(3) if the alien shows that it is more likely than not that her life or freedom would be threatened in the country of removal because of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(2); *see also Haoua v. Gonzales*, 472 F.3d 227, 232 (4th Cir. 2007). The alien bears the burden of demonstrating that her life or freedom would be threatened on account of a protected ground. *See* 8 C.F.R. § 208.16(b)(2). Because withholding of removal

is mandatory if the alien meets the standard of proof, *see INS v. Stevic*, 467 U.S. 407, 426, 429-30 (1984); *Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004), the alien must meet a higher standard for withholding of removal than for asylum. *See Camara*, 378 F.3d at 367.

On review, we afford the BIA's determination of eligibility for withholding of removal a high degree of deference. In fact, "a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). We review the administrative findings of fact under the substantial evidence standard, *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), and these "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 354 (4th Cir. 2006) ("[T]he substantial evidence test for review of the BIA's conclusions mandates affirmance if the evidence is not 'so compelling that no reasonable factfinder could' agree with the BIA's factual conclusions." (quoting *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992))). Even "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Gonahasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999) (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966)) (internal quotation marks omitted).

Where the BIA adopts and supplements the immigration judge's decision, "the factual findings and reasoning contained in both decisions are subject to judicial review." *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008) (quoting *Niang v. Gonzales*, 492 F.3d 505, 511 n.8 (4th Cir. 2007)) (internal quotation marks omitted).

The immigration judge denied Gomis' application for withholding of removal, finding that "there is some small chance, perhaps what even amounts to a reasonable *possibility*, given

her parents['] interest and desire in having her undergo FGM, that she would be subjected to this practice," but that "*it is not . . . anything close to a more likely than not chance*." (Emphasis added). The judge detailed the evidence in the record that supported his finding. On appeal, the BIA likewise determined that Gomis failed to demonstrate a clear probability that she would be forced to undergo FGM and found no clear error in the immigration judge's factual findings. The BIA stated that "while people continue to practice FGM in Senegal in the rural areas, the practice of FGM is growing less common and is rare in large urban areas, and the government of Senegal has enacted laws criminalizing the practice." It noted that "[t]he record reflects that the government has prosecuted those caught engaging in the practice of FGM and has fought to end the practice by collaborating with other groups to educate people about the inherent dangers," emphasizing that "140 villages renounced the use of FGM." "Further, the record reflects that FGM is hardly practiced in the most heavily populated urban areas such as that where respondent is from and that 90 percent of the females who undergo FGM are between 2 and 5 years of age." Thus, the BIA concluded: "we acknowledge that the 28-year-old respondent may have a subjectively genuine fear of FGM if she is returned to Senegal; however, we agree that she has failed to meet her burden of establishing that it is objectively more likely than not that she would be subjected to the procedure if returned to Senegal."

Because substantial evidence supports the immigration judge and BIA's findings, we affirm the denial of Gomis' application for withholding of removal because a reasonable adjudicator would not be *compelled* to conclude to the contrary. *See* 8 U.S.C. § 1252(b)(4)(B). The record shows that the incidence of FGM in Senegal is low and that the practice hardly occurs in urban areas, such as Dakar. Further, most women have *not* been forced to undergo FGM, and the incidence of FGM is decreasing. Gomis, as an adult, is even less likely to be forced to undergo FGM because 90% of the

women who undergo the procedure are between two and five years old at the time of the procedure. In addition, both practicing FGM and ordering FGM to be carried out on a third party are crimes, and prosecutors now bring criminal charges against perpetrators. Gomis was 29 years old when the BIA dismissed her appeal, and her family lives in Dakar. She is relatively well educated, especially in a country where the adult illiteracy rate approaches 40%, having had 12 years of schooling. The weight of the record evidence, including her age, her education, and the decreased incidence of FGM in Senegal, specifically in Dakar, supports the immigration judge and BIA's finding that it is not more likely than not that Gomis will face persecution.

Although there is evidence in the record that tends to support Gomis' claim that if she returns to Senegal, she will face a risk of FGM, we do not find that "any reasonable adjudicator would be compelled to conclude" that she would, more likely than not, be subjected to FGM. *See* 8 U.S.C. § 1252(b)(4)(B). The agency's finding is supported by substantial evidence, and even if this court would be inclined to decide differently in the first instance, it must affirm under the deferential standard of review. *See Niang*, 492 F.3d at 511 ("[W]here the 'record . . . plausibly could support two results: the one the IJ chose and the one [the petitioner] advances,' reversal is only appropriate where the court 'find[s] that the evidence not only supports [the opposite] conclusion, but *compels* it.'" (quoting *Balogun v. Ashcroft*, 374 F.3d 492 (7th Cir. 2004) (alterations in original)); *Gonahasa*, 181 F.3d at 541 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (alteration in original) (citation and internal quotation marks omitted)).

Gomis argues that this court's decision in *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007), entitles her to relief. In *Haoua*, the alien, a native and citizen of Niger, petitioned for

review of the BIA's affirmance of the immigration judge's denial of her application for asylum, withholding of removal, and relief under the Convention Against Torture. While the alien, Mahaman Haoua, was living in the United States, her parents arranged for her to marry the elderly chieftain of a neighboring village, accepted a large dowry as consideration for the wedding promise, and conducted the wedding in her absence. *Haoua*, 472 F.3d at 229-30. In accordance with the customs of the ethnic group of which Haoua was a member, her parents planned on subjecting her to FGM before she joined her husband's household. *Id.* The evidence adduced at Haoua's hearing showed that one in five Nigerian women undergo FGM and that certain ethnic groups still practice FGM despite a new law criminalizing it. *Id.* at 230. Haoua testified that her ethnic group continues to practice FGM, requiring the procedure be performed before a woman marries, and that the Nigerian government's efforts to suppress FGM have been ineffective in rural Nigeria, where her family resides. *Id.* The immigration judge found that Haoua had "at least a 10 percent chance" of undergoing FGM if she returned to her family in Niger. *Id.* The immigration judge also found, however, that Haoua could relocate within Niger, concluding that her "reasonably available internal relocation alternative overcomes the 10 percent fear of FGM at the hands of her family." *Id.* at 231. On that basis, the immigration judge denied Haoua's application for asylum, withholding of removal, and relief under the Convention Against Torture. *Id.* The BIA affirmed the immigration judge without opinion.

On appeal, we held that "the 10% finding was not supported by substantial evidence," *id.* at 232, noting that the 10% finding "was necessarily premised on speculation and conjecture, in that there was no evidentiary basis for it." *Id.* We placed considerable importance on the fact that "the Attorney General conceded this very point during oral argument, acknowledging that, contrary to the [immigration judge's] finding, if [Haoua] returned to her family, her likelihood of suffering FGM would approach 100%." *Id.* Even

though the immigration judge had found that Haoua could relocate in Niger to avoid FGM, which was an alternative basis for denying her application for asylum, "the [immigration judge]'s finding regarding relocation was *specifically predicated on the 10% finding*" inasmuch as he found that Haoua's "reasonably available internal relocation alternative *overcomes* the 10 percent fear of FGM at the hands of her family." *Id.* (first emphasis added). We found it problematic that the immigration judge did not consider whether Haoua's relocation alternative could overcome a risk of FGM that was *greater than* 10%, in light of both the immigration judge's finding that she had "*at least* a 10 percent chance" of undergoing FGM if she returned to Niger and the government's concession on appeal that the risk approached 100%. *Id.* at 232-33. Accordingly, we vacated the immigration judge's order denying her applications for asylum and withholding of removal and remanded the case to the BIA for further proceedings. *Id.* at 233.

Although there are factual similarities between *Haoua* and the case before us, the case before us is distinguishable inasmuch as there *is* substantial evidence to support the agency's finding that it is not more likely than not that Gomis will be subjected to FGM. In *Haoua*, we held that the 10% finding, on which the immigration judge based his conclusion, was speculative and not based on substantial evidence in the record, particularly in light of the government's concession at oral argument that her risk approached 100%. Here, the immigration judge's findings that there is "some small chance" that she will undergo FGM, but that "it is not . . . anything close to a more likely than not chance," findings which were affirmed by the BIA, are supported by substantial evidence in the record. This finding, quite unlike the 10% finding, is not mere speculation or conjecture. As discussed above, the evidence in this record shows that the incidence of FGM in Senegal is low; that 90% of the victims of FGM in Senegal are between two and five years of age at the time of the procedure; that FGM is hardly practiced in urban areas like Dakar;

and that the criminal law forbidding FGM is enforced. By contrast, Gomis is an adult, she is relatively well educated in light of her 12 years of schooling, and her family lives in Dakar.

Because the BIA's determination in this case is not manifestly contrary to law and its finding that there is not a more-likely-than-not chance that Gomis will be subjected to FGM is supported by substantial evidence, we affirm its decision to deny Gomis' application for withholding of removal.

Having rejected Gomis' arguments, we deny her petition for review and affirm the BIA's order.

*PETITION DENIED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Although the majority fairly characterized the facts in this case, it errs in attempting to distinguish an indistinguishable case: *Haoua v. Gonzales*, 472 F.3d 227 (4th Cir. 2007). In *Haoua*, this Court found that substantial evidence did not support the IJ's and the BIA's finding that if petitioner were sent back to her country she would have a ten percent likelihood of facing FGM. Like Gomis, the petitioner in *Haoua* received great pressure from her family to marry a man who had paid a dowry for her and expected her to be circumcised. As in the case at bar, Haoua's future husband was growing impatient waiting for her return. Haoua, like Gomis, was an adult woman who was well past puberty. In fact, Haoua, at forty years of age, was substantially older than Gomis. The only distinguishable fact in *Haoua* was that the Attorney General conceded at oral argument that if returned to her country, the likelihood of the petitioner suffering FGM would approach 100%. Although there is no such concession here, Gomis presents a mountain of evidence that clearly demonstrates that the likelihood of her being forced to undergo FGM is cer-

tainly 100%. Unfortunately, the majority repeats the erroneous analysis of the IJ and BIA in denying Gomis's petition for withholding of removal. I respectfully dissent from this portion of the opinion, but concur in the majority's judgment as to the remaining issues.

## I.

Like the IJ and the BIA before it, the majority incorrectly focuses on general statistics without applying the relevant information specific to Gomis's situation.[1] While the State Department's report finds that only 20% of Senegalese women have undergone FGM and that 90% of the women who had undergone the procedure were between the ages of two and five, this does not contradict Gomis's testimony that 80% to 100% of women in *her specific ethnic group* have undergone FGM either as a puberty rite or just before they were married. As the majority points out, Senegal has a population of over 12 million people.[2] If we estimate that half of

---

[1]We would be remiss if we discussed in distant legalese the underlying act, which can only be fully appreciated in plain language:

> Female genital mutilation, commonly called FGM, is the designation generally given to a class of surgical procedures involving the removal of some or all of the external genitalia performed primarily on girls and young women in Africa and Asia. Often performed under unsanitary conditions with highly rudimentary instruments, FGM is extremely painful, permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications, including bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. FGM can result in the permanent loss of genital sensation in the victim and can adversely affect sexual function.

*Haoua*, 472 F.3d at 228 n.5 (internal citation and quotations omitted). Where there is such a threat of permanent harm—a harm that also includes Gomis's real fear of exposure to HIV/AIDS—there is no room for error or speculation.

[2]The population is currently closer to 14 million, yet for the purpose of this dissent I will use the figures asserted by the majority, which likely refer to the period of Gomis's petition. *See* https://www.cia.gov/library/publications/the-world-factbook/geos/sg.html (last visited May 22, 2009).

the population is female, then at least 1.2 million women have undergone FGM in Senegal and 120,000 of those women were over the age of five when they underwent the procedure. Senegal is made up of a wide variety of ethnic groups. Gomis's ethnic group is one of the smaller ethnic groups,[3] which makes her testimony—that a large percentage of a small percentage of the population practices circumcision—even more compatible with the State Department's report. The IJ found Gomis to be credible but discredited her testimony because of a nonexistent conflict between her stated percentages and those in the State Department's report.

The majority seems to accept the IJ's and the BIA's assertion that Gomis's age will save her from circumcision, despite the fact that her family sent her many letters while she was in her twenties indicating that they continued to insist that she be circumcised. It is clear that Gomis's age will provide no protection. Further, the logic that her urban upbringing will protect her is also fallacious. Considering that her ethnic group is largely from rural areas, her family likely adheres to deep-rooted cultural practices that exist outside of her immediate family's urban location.

The majority emphasizes that "[t]he BIA stated that 'while people continue to practice FGM in Senegal in rural areas, the practice of FGM is growing less common and is rare in large urban areas, and the government of Senegal has enacted laws criminalizing the practice.'" (Maj. Op. 12.) Yet, the IJ, who found Gomis credible, heard testimony that both Gomis and her brother attempted to report her parents to the authorities for their practice of FGM, and their urban area police told them that it was beyond their jurisdiction, as FGM is a family affair. This testimony is not surprising. The State Department's report, which the IJ relied upon, stated that although Senegal banned FGM in 1999, since the passage of the law

---

[3]Gomis's ethnic group represents only 3.7% of the population of Senegal. (*Id.*)

there have been no convictions. The report provides that "although the government has been active in seeking to eradicate the practice, we are unaware of any protection in place that might help a woman who wished to avoid it." (J.A. 225.) Additionally, the report mentions that a family was arrested for forcing a five-year-old child to undergo FGM; however, "the cases were not pursued and no convictions resulted" because of an "emotional public outcry" against the criminalization of such practices. (*Id.*)

It was unreasonable for the IJ to rely on the portion of the country report that says that FGM is outlawed in a country and ignore the other evidence from the report, and elsewhere, that the country in question is not enforcing such laws. *See Agbor v. Gonzales*, 487 F.3d 499, 504 (7th Cir. 2007) (finding that despite the fact that Cameroon officially opposed FGM and publicly endorsed the efforts of NGO to end the practice, the BIA could not "simply seize on a few 'flowery bromides' of governmental concern over human rights violations when the remainder of the report describes incidents of persecution consistent with a petitioner's claim." (internal citation omitted)). Gomis has put forth a substantial amount of evidence that the Senegalese police will not help protect her from FGM despite the illegality of the practice in Senegal. Therefore, the record before this Court indicates not only that Gomis will more likely than not be forcibly circumcised, but also that she will have little recourse or hope of bringing her assailants to justice.

Next, although the majority notes that Gomis offered a letter from her father, the majority appears to miss the grave circumstances she will face should she return to Senegal. The certainty of her persecution is made clear in her father's letter dated September 20, 2006, where he wrote:

> Francoise, I will advise you [in] this last letter very seriously. . . . I am ashamed and humiliated because of what you did to me an [sic] the entire Gomis fam-

ily. You know the gravity on [sic] what you've caused. I guarantee you that you'll not get from this situation. I think all means will be necessary to bring you back in Senegal, and I mean it. You'll be circumcised and sent into marriage before my death. I will never forgive you, if you don't return to Dakar for the circumcision.

(J.A. 98.) It is difficult to understand how the majority can essentially nullify the unequivocal language in her father's letter. This is a rare case where we need not speculate on percentages. Her father clearly states, "I guarantee you that you'll not get from this situation. . . . You'll be circumcised and sent into marriage before my death." Therefore, if this Court found that the likelihood of Haoua suffering FGM if returned to her home country "*would approach* 100%," *Haoua*, 472 F.3d at 232 (emphasis added), then the likelihood that Gomis will be circumcised if returned to Senegal *is* 100%.

The IJ found Gomis credible, which means that her testimony regarding the practices of her specific ethnic group should have been properly considered, along with the abundance of evidence from her family that *she will* be circumcised upon her return. Only by reading the State Department's report generally, and isolating Gomis's age and urban upbringing in order to apply them blindly to the statistics presented, can one possibly conclude that Gomis is unlikely to undergo FGM. To deny her withholding of removal and send her back to Senegal, to virtually certain circumcision, would be a great miscarriage of justice. If we choose to ignore the blatant evidence before us of her specific situation by shielding our eyes with general statistics, then we will be sending her to a torturous future of which I shudder to imagine. Thus, I dissent.