GREGORY, Circuit Judge,
concurring in part and dissenting in part:
Although the majority fairly characterized the facts in this case, it errs in attempting to distinguish an indistinguishable case: Haoua v. Gonzales, 472 F.3d 227 (4th Cir.2007). In Haoua, this Court found that substantial evidence did not support the IJ’s and the BIA’s finding that if petitioner were sent back to her country she would have a ten percent likelihood of facing FGM. Like Gomis, the petitioner in Haoua received great pressure from her family to marry a man who had paid a dowry for her and expected her to be circumcised. As in the case at bar, Haoua’s future husband was growing impatient waiting for her return. Haoua, like Gomis, was an adult woman who was well past puberty. In fact, Haoua, at forty years of age, was substantially older than Gomis. The only distinguishable fact in Haoua was that the Attorney General conceded at oral argument that if returned to her country, the likelihood of the petitioner suffering FGM would approach 100%. Although there is no such concession here, Gomis presents a mountain of evidence that clearly demonstrates that the likelihood of her being forced to undergo FGM is certainly 100%. Unfortunately, the majority repeats the erroneous analysis of the IJ and BIA in denying Gomis’s petition for withholding of removal. I respectfully dissent from this portion of the opinion, but concur in the majority’s judgment as to the remaining issues.
*363 I.
Like the IJ and the BIA before it, the majority incorrectly focuses on general statistics without applying the relevant information specific to Gomis’s situation.[1] While the State Department’s report finds that only 20% of Senegalese women have undergone FGM and that 90% of the women who had undergone the procedure were between the ages of two and five, this does not contradict Gomis’s testimony that 80% to 100% of women in her specific ethnic group have undergone FGM either as a puberty rite or just before they were married. As the majority points out, Senegal has a population of over 12 million people.[2] If we estimate that half of the population is female, then at least 1.2 million women have undergone FGM in Senegal and 120,-000 of those women were over the age of five when they underwent the procedure. Senegal is made up of a wide variety of ethnic groups. Gomis’s ethnic group is one of the smaller ethnic groups,[3] which makes her testimony — that a large percentage of a small percentage of the population practices circumcision — even more compatible with the State Department’s report. The IJ found Gomis to be credible but discredited her testimony because of a nonexistent conflict between her stated percentages and those in the State Department’s report.
The majority seems to accept the IJ’s and the BIA’s assertion that Gomis’s age will save her from circumcision, despite the fact that her family sent her many letters while she was in her twenties indicating that they continued to insist that she be circumcised. It is clear that Gomis’s age will provide no protection. Further, the logic that her urban upbringing will protect her is also fallacious. Considering that her ethnic group is largely from rural areas, her family likely adheres to deep-rooted cultural practices that exist outside of her immediate family’s urban location.
The majority emphasizes that “[t]he BIA stated that ‘while people continue to practice FGM in Senegal in rural areas, the practice of FGM is growing less common and is rare in large urban areas, and the government of Senegal has enacted laws criminalizing the practice.’ ” (Maj.Op. 360.) Yet, the IJ, who found Gomis credible, heard testimony that both Gomis and her brother attempted to report her parents to the authorities for their practice of FGM, and their urban area police told *364 them that it was beyond their jurisdiction, as FGM is a family affair. This testimony is not surprising. The State Department’s report, which the IJ relied upon, stated that although Senegal banned FGM in 1999, since the passage of the law there have been no convictions. The report provides that “although the government has been active in seeking to eradicate the practice, we are unaware of any protection in place that might help a woman who wished to avoid it.” (J.A. 225.) Additionally, the report mentions that a family was arrested for forcing a five-year-old child to undergo FGM; however, “the cases were not pursued and no convictions resulted” because of an “emotional public outcry” against the criminalization of such practices. (Id.)
It was unreasonable for the IJ to rely on the portion of the country report that says that FGM is outlawed in a country and ignore the other evidence from the report, and elsewhere, that the country in question is not enforcing such laws. See Agbor v. Gonzales, 487 F.3d 499, 504 (7th Cir. 2007) (finding that despite the fact that Cameroon officially opposed FGM and publicly endorsed the efforts of NGO to end the practice, the BIA could not “simply seize on a few ‘flowery bromides’ of governmental concern over human rights violations when the remainder of the report describes incidents of persecution consistent with a petitioner’s claim.” (internal citation omitted)). Gomis has put forth a substantial amount of evidence that the Senegalese police will not help protect her from FGM despite the illegality of the practice in Senegal. Therefore, the record before this Court indicates not only that Gomis will more likely than not be forcibly circumcised, but also that she will have little recourse or hope of bringing her assailants to justice.
Next, although the majority notes that Gomis offered a letter from her father, the majority appears to miss the grave circumstances she will face should she return to Senegal. The certainty of her persecution is made clear in her father’s letter dated September 20, 2006, where he wrote:
Francoise, I will advise you [in] this last letter very seriously.... I am ashamed and humiliated because of what you did to me an [sic] the entire Gomis family. You know the gravity on [sic] what you’ve caused. I guarantee you that you’ll not get from this situation. I think all means will be necessary to bring you back in Senegal, and I mean it. You’ll be circumcised and sent into marriage before my death. I will never forgive you, if you don’t return to Dakar for the circumcision.
(J.A. 98.) It is difficult to understand how the majority can essentially nullify the unequivocal language in her father’s letter. This is a rare case where we need not speculate on percentages. Her father clearly states, “I guarantee you that you’ll not get from this situation.... You’ll be circumcised and sent into marriage before my death.” Therefore, if this Court found that the likelihood of Haoua suffering FGM if returned to her home country “would approach 100%,” Haoua, 472 F.3d at 232 (emphasis added), then the likelihood that Gomis will be circumcised if returned to Senegal is 100%.
The IJ found Gomis credible, which means that her testimony regarding the practices of her specific ethnic group should have been properly considered, along with the abundance of evidence from her family that she will be circumcised upon her return. Only by reading the State Department’s report generally, and isolating Gomis’s age and urban upbringing in order to apply them blindly to the statistics presented, can one possibly con- *365 elude that Gomis is unlikely to undergo FGM. To deny her withholding of removal and send her back to Senegal, to virtually certain circumcision, would be a great miscarriage of justice. If we choose to ignore the blatant evidence before us of her specific situation by shielding our eyes with general statistics, then we will be sending her to a torturous future of which I shudder to imagine. Thus, I dissent.

. We would be remiss if we discussed in distant legalese the underlying act, which can only be fully appreciated in plain language:
Female genital mutilation, commonly called FGM, is the designation generally given to a class of surgical procedures involving the removal of some or all of the external genitalia performed primarily on girls and young women in Africa and Asia. Often performed under unsanitary conditions with highly rudimentary instruments, FGM is extremely painful, permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications, including bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. FGM can result in the permanent loss of genital sensation in the victim and can adversely affect sexual function.
Haoua, 472 F.3d at 228 n. 5 (internal citation and quotations omitted). Where there is such a threat of permanent harm — a harm that also includes Gomis’s real fear of exposure to HIV/AIDS-there is no room for error or speculation.

. The population is currently closer to 14 million, yet for the purpose of this dissent I will use the figures asserted by the majority, which likely refer to the period of Gomis’s petition. See https://www.cia.gov /library/publications/the-world-factbook/geos/sg.html (last visited May 22, 2009).

. Gomis’s ethnic group represents only 3.7% of the population of Senegal. (Id.)